# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| DORIS M. SOLSOL and YOLI SANDRA RODRIGUEZ DIAZ, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiffs, )<br>v. )<br>SCRUB, INC., TERESA KAMINSKA, and MARK RATHKE, )<br>Defendants. ) | No. 13 CV 7652<br><br>Judge Robert W. Gettleman |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Doris Solsol and Yoli Rodriguez Diaz, individually and on behalf of all others similarly situated, have brought a putative collective action complaint against defendants Scrub, Inc. ("Scrub"), Teresa Kaminska, and Mark Rathke alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. This court conditionally certified a class of Scrub employees pursuant to 29 U.S.C. § 216(b) on April 27, 2015. Defendants have moved to decertify the class. For the reasons stated below, defendants' motion is granted.

## BACKGROUND[1]

Scrub is a company that provides janitorial services in the Chicago area. Defendant Kaminska is Scrub's Vice President of Operations and defendant Rathke is Scrub's General Manager. Since at least October 2010, Scrub employees working at O'Hare International Airport ("O'Hare") have provided an array of janitorial services under one of three types of

---

[1] The following facts are, unless otherwise specified, undisputed and come from the parties' Local Rule 56.1 Statements. Defendants' objection to plaintiffs' inclusion of 138 material facts in violation of L.R. 56.1 is noted and well taken.

contracts: (1) a contract with the City of Chicago to clean the domestic terminals;[2] (2) separate contracts with individual airlines for janitors to clean gates and other areas; and (3) separate contracts with individual airlines to clean airplane cabins. Additionally, some Scrub employees who work at O'Hare do not perform any janitorial functions and instead load trucks with supplies for the aircraft of various airlines.

Most Scrub employees working at O'Hare clock in and out at the start and end of their shifts using one of at least thirteen timeclocks in various locations. Some Scrub employees who work outside of the terminals do not have access to a timeclock and instead call their supervisors to report that they have arrived at or are departing from their worksite. Once an employee has reported their hours for the day (or week, depending on the supervisor's practices), supervisors fill out Supervisor Payroll Input Sheets ("input sheets") to record the time each employee worked. Sarah Coady, Scrub's Payroll Specialist, uses these input sheets, not the time cards, to calculate Scrub's employee payroll.

Plaintiffs claim that their compensation, as determined by the input sheets, violates the FLSA for several reasons. First, plaintiffs allege that Kaminska trains supervisors to record on the input sheets only scheduled hours, and then only if the employee does not arrive late or leave early. According to plaintiffs, this practice fails to compensate an employee who starts work early and leaves on time or starts work on time and works late. Second, plaintiffs allege that supervisors are taught to round time to the nearest 15 minutes when an employee arrives late or leaves early, and that this practice undercompensates them for time worked. Third, plaintiffs allege that 30 minutes are automatically deducted from each employee's scheduled shift to account for a meal break, even when the employee is ordered to return to work during the break.

---

[2] Both of the named plaintiffs worked in the areas covered by this contract, which ended on December 31, 2012, and was not renewed by the city. Neither named plaintiff has worked at Scrub since.

2

On April 27, 2015, the court conditionally certified a Rule 216(b) class consisting of individuals who have worked for Scrub as hourly non-exempt employees at O'Hare since October 24, 2010, whose payroll was calculated from supervisor payroll input sheets and who were not paid for time worked. Since then, more than 750 plaintiffs have opted in.[3]

**DISCUSSION**

**I.     Legal Standard**

Under the FLSA, "employees are entitled to overtime pay (i.e., one and one-half times the regular rate) for any hours worked in excess of forty hours per week, unless they come within one of the various exemptions set forth in the Act." Shaefer-LaRose v. Eli Lilly & Co., 679 F.3d 560, 572 (7th Cir. 2012) (citing 29 U.S.C. §§ 207, 213). Section 216(b) of the FLSA permits plaintiffs to bring a collective action against an employer for unpaid minimum wages or overtime compensation on behalf of themselves and others "similarly situated." 29 U.S.C. § 216(b). A collective action under section 216(b) differs from a class action under Fed. R. Civ. P. 23 in that Rule 23 binds class members unless they opt out, whereas collective action members are bound under section 216(b) only if they opt into the action by providing their written consent.[4] Woods v. New York Life Ins. Co., 686 F.2d 578, 579-80 (7th Cir. 1982). In the Seventh Circuit, certification of the two types of action is governed by the same standards. Espenscheid v. DirectSat USA, LLC, 705 F.3d 770, 772 (7th Cir. 2013). "District courts have broad discretion in managing collective actions under the FLSA." Camilotes v. Resurrection Health Care Corp., 286 F.R.D. 339, 345 (N.D. Ill. 2012) (citing Alvarez v. City of Chicago, 605 F.3d 445, 448 (7th Cir. 2010)).

---

[3] According to plaintiffs, 868 plaintiffs have opted in. Defendants argue that only 769 of them are eligible plaintiffs. Whether either of these numbers is accurate is irrelevant to the court's analysis.

[4] Plaintiffs have not moved for certification under Fed. R. Civ. P. 23.

3

As explained in the court's April 27, 2015, opinion, courts in this district employ a two-step process for determining whether an FLSA lawsuit should proceed as a collective action. Dailey v. Groupon, Inc., 2014 WL 4379232, at *3 (N.D. Ill. Aug. 27, 2014). The first step requires the named plaintiff(s) to establish that the potential class members are similarly situated by making a modest factual showing that they were victims of a common policy or plan to violate the law. Id. "[T]he similarly situated standard is a liberal one . . . [that] typically results in conditional certification of a representative class." Rottman v. Old Second Bancorp, Inc., 735 F. Supp. 2d 988, 990 (N.D. Ill. 2010) (internal quotations omitted). The modest factual showing standard is lenient and demands only some factual support. Johnson v. Pinstripes, Inc., 2013 WL 5408657, at *2 (N.D. Ill. Sept. 26, 2013). Under this lenient standard, the court conditionally certified a Rule 216(b) class.

The case has now progressed to the second step, which takes place following discovery. At this stage the analysis is more stringent. Rottman v. Old Second Bancorp, Inc., 735 F. Supp. 2d 988, 990 (N.D. Ill. 2010). "Once it is known which employees will be part of the class, the Court must reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis." Id. To show that they are similarly situated, plaintiffs "must demonstrate similarity beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws must be present." Russell v. Illinois Bell Tel. Co., Inc., 721 F. Supp. 2d 804, 812 (N.D. Ill. 2010).

To determine whether proceeding as a collective action is appropriate, the court must consider: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be

individually applied to each plaintiff; and (3) fairness and procedural concerns." Strait v. Belcan Eng'g Group, Inc., 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012) (internal quotations omitted). At this stage, "Plaintiffs bear the burden of demonstrating that they are similarly situated," id., and defendants "may move to decertify the case or divide the class into subclasses." Johnson, 2013 WL 5408657, at *3 (internal quotations omitted). Because defendants have moved to decertify the class, the court must reevaluate plaintiffs' conditional certification and "determine whether it can manage the case and bring about a fair and reasonably expeditious resolution of the collective action." Russell, 721 F. Supp. 2d at 811.

## II. Analysis

Plaintiffs must "demonstrate similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated" to proceed as a collective action. Id. at 812 (internal quotations omitted). "[A]n identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present." Id. "A collective action is not appropriate when determining whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry." Camilotes, 286 F.R.D. at 346 (citing Alvarez, 605 F.3d at 449); see also Strait, 911 F. Supp. 2d at 720 ("[T]he issue for certification is whether Plaintiffs are similarly situated—whether a common question exists that can be answered without individualized inquiries.") (citing 29 U.S.C. 216(b)). Keeping these principles in mind, the court has spent considerable time reviewing an enormous record that spans several hundred pages and, in its discretion, finds that the plaintiffs are too dissimilarly situated for the case to proceed as a collective action under the FLSA.

### A. Plaintiffs' Factual and Employment Settings

To determine if plaintiffs are similarly situated, courts typically analyze their factual and employment settings by considering their job locations, job duties, supervision, and any policies or practices that bind the plaintiffs' claims together. Camilotes, 286 F.R.D. at 346. With the exception of location, which is debatable, all of these factors clearly weigh against certification.

As for location, there is only one common thread tying the opt-in plaintiffs together: O'Hare Airport. Within O'Hare, the opt-in plaintiffs worked in a multitude of areas that stretched to a number of terminals and beyond. Some worked in the terminals cleaning jet bridges, VIP lounges, floors, and bathrooms while others worked outside of the terminals cleaning hangars, ticket counters, and cargo, maintenance and administrative buildings. Some opt-in plaintiffs worked on the airplanes cleaning and doing "security checks," and still others worked in the provisions department, stocking trucks with supplies for the airplanes. Although all of the opt-in plaintiffs worked at O'Hare, whether they are similarly situated is, at the very least, called into question by the enormity of the airport[5] combined with the disparate locations where they worked. See Creal v. Group O, Inc., 155 F. Supp. 3d 831 (N.D. Ill. 2016) (finding that the opt-in plaintiffs' disparate positions throughout a Caterpillar manufacturing plant that was "vast" in size weighed in favor of decertification of the conditional class). Even if the court were to decide that the opt-in plaintiffs were similarly situated with regard to location, however, the disparity in their job duties, supervision, and the policies to which they adhered do not bind them together.

---

[5] O'Hare International Airport has four terminals that span 4.8 million square feet and sit on 11.25 square miles of property, including the runways. See Comparing O'Hare and Changi Airports, Chi. Trib., Feb. 27, 2015, available at http://www.chicagotribune.com/business/columnists/chi-comparing-ohare-and-changi-airports-20150226-htmlstory.html.

As discussed above, the opt-in plaintiffs worked for Scrub in several different capacities and departments, which were located throughout O'Hare. The opt-in plaintiffs' work schedules also varied widely depending on what they did, where they worked, and for whom. Each of the many positions the opt-in plaintiffs held had three shifts: first, second, and third. The opt-in plaintiffs reported to a number of offices in one of several terminals depending on where and when they worked. Within those varying offices, opt-in plaintiffs reported to more than forty different supervisors. Each supervisor oversaw several different crews that ranged in size from a few employees to twenty or more, each of which was directed by a "lead." In some departments, the leads were responsible for documenting crew members' hours on the input sheets (which were later reviewed by the supervisors).

With the opt-in plaintiffs' varying job duties came different supervisors, and with the different supervisors came varying practices relating to start times, meal breaks, and rounding. As for start times, the named plaintiffs claim that their supervisors required them to arrive at work thirty minutes before the start of their shifts and that they began working upon arrival.[6] The opt-in plaintiffs' claims regarding pre-shift work, however, vary drastically. Some of the opt-in plaintiffs claim that their supervisors required them to arrive, and begin working, fifteen minutes early.[7] Others claim that they were required to be ready to work at their start time and therefore regularly arrived early to gather supplies before the shift. Within this category, some claim that they worked for five to ten minutes gathering supplies before their shift,[8] while others claim that this took only about a minute.[9] At least one opt-in plaintiff claims that she regularly

---

[6] See Def. Ex. 11 at pp. 29, 31, 39; Def. Ex. 11 at pp. 122—25, 147—49.
[7] See Doc. 417-1 at pp. 45, 60, 103.
[8] See Doc. 417-1 at pp. 34, 38.
[9] See Def. Ex. 7 at 72; Def. Ex. 8 at 68.

7

clocked in early, but often spent that time socializing and playing games on her phone.[10] Some opt-in plaintiffs do not claim to have punched in or worked at all prior to the start of their shifts.[11] For those who do claim to have worked prior to their scheduled start time, some claim that they first clocked in, then gathered their supplies,[12] while others claim that they gathered their supplies first and then clocked in.[13]

The variance in claims regarding the thirty-minute unpaid meal break is equally drastic and somewhat dependent on which position each opt-in plaintiff held. For example, janitors had a regularly scheduled meal break, but were expected to respond to emergency situations, like unexpected spills, and were sometimes interrupted during their break to do so. Additionally, some janitors claim that they were required to take their meal breaks in specific areas, which were varying distances from where they worked. Scrub's policy was to allow time, in addition to the meal break, for the janitors to travel to and from the designated area.[14] Many of them, however, allege that they were not allowed to leave their work area until the start of their breaks and were expected to be back in their work areas when their breaks ended. Accordingly, the amount of break time spent walking to and from the break area, and therefore not on break, was uncompensated and varies depending on how far it took each janitor to walk to the designated break area. For example, some janitors claim to have lost five minutes of their break approximately three days a week,[15] some claim to have lost twenty minutes of their break one day a week,[16] some claim to have lost three to five minutes before and after every meal break,[17]

---

[10] See Def. Ex. 8 at 63—64.
[11] See Doc. 417; Doc. 418.
[12] See Def. Ex. 8 at p. 43.
[13] See Def. Ex. 7 at p. 128.
[14] See Def. Ex. 9 at p. 180; Def. Ex. 15 at p. 242.
[15] See Doc. 422 at p. 32.
[16] See Doc. 422 at p. 38.
[17] See Doc. 422 at p. 2.

8

some claim to have lost a total of ten to fifteen minutes of each break,[18] and many others simply claim to have lost "part" of their break.[19] Other janitors do not claim to have lost any time walking to and from the break room because they were allowed to take their meal break in their work area.[20] Still others claim to have never taken a meal break because they had too much work to do.[21]

Cabin cleaners, on the other hand, did not have a regularly scheduled meal break. Their schedules were dictated by "planners" who communicated with supervisors and leads regarding the arrival of airplanes that needed to be cleaned. The lead or supervisor would alert the planners when the crew had finished cleaning an airplane and the planners would either send that crew to clean another airplane or, if time permitted, tell them to take their meal break. If an airplane arrived during the thirty-minute meal break and needed to be cleaned, the crew was sent to clean it and their meal break was interrupted. When this happened, Scrub's policy was to provide the crew with another thirty-minute meal break later in the shift or pay the crew for the full thirty minutes.[22] To what extent that policy was adhered to is widely disputed. Some opt-in plaintiffs claim to have never enjoyed a full thirty-minute meal break,[23] some claim to have worked during at least twenty minutes of every meal break,[24] some claim to have worked during at least ten minutes of every meal break,[25] and some claim to have "typically" reported back to work before their meal break ended.[26] Still others do not claim any lost time during meal breaks.[27]

---

[18] See Doc. 420 at pp. 8, 12, 14, 16.
[19] See Doc. 420 at pp. 1, 2, 11, 17.
[20] See Doc. 422 at p. 25.
[21] See Doc 420 at p. 29.
[22] See Def. Ex. 4 at pp. 78—80; Def. Ex. 12 at para. 10.
[23] See Def. Ex. 7 at pp. 51—2.
[24] See Doc. 424 at p. 4.
[25] See Doc. 424 at p. 6.
[26] See Doc. 424 at p. 8.
[27] See Doc. 424 at pp.15—16; Doc. 417; Doc. 418.

As for Scrub's rounding policy, Kaminska testified in her deposition that each supervisor implements his or her own rounding practices. That testimony is supported by the record. For example, one Scrub supervisor stated that any amount of time registered on a punch card under seven minutes was rounded down to the previous fifteen-minute increment, while any amount of time over seven minutes was rounded up to the next fifteen-minute increment.[28] Another supervisor stated that she does not round down, but does round up to the next fifteen-minute increment after eight minutes and to the next thirty-minute increment after twenty five minutes.[29] Additionally, Diaz claims that her supervisors told her that fifteen minutes would be deducted from her time if she clocked in as little as one minute late.[30] Whether all of the opt-in plaintiffs were subject to the same rounding policy is called into question by these varying claims.

Plaintiffs argue, relying primarily on Russell, 721 F.Supp.2d 804, that the variations described above do not justify decertification. Plaintiffs' reliance is misplaced for two reasons. First, the facts in the instant case are distinguishable. In Russell, all of the plaintiffs were sales and service representatives at Illinois Bell call centers. Although they worked at four different locations, all of the plaintiffs followed the same predetermined schedule and were subject to the same policies regarding when during their shifts they were required to be "open and available," meaning logged on to their computers and ready to take incoming calls. Id. at 807—09. To be "open and available," each plaintiff took exactly the same steps: they logged onto their computers and opened the necessary applications. Id. at 809. Additionally, the plaintiffs' claims regarding alleged unpaid overtime all fell into one of three distinct categories: (1) the time they spent logging into their computers before their shift started; (2) time they spent doing customer-service related tasks during their lunch breaks; and (3) time they spent speaking with their final

---

[28] See Def. Ex. 5 at pp. 129—130.
[29] See Def. Ex. 4 at p. 67.
[30] See Def. Ex. 11 at pp. 146—147.

customer after their shift ended. The policies adhered to and the claims made by the plaintiffs in the instant case are not nearly so uniform.

Second, Russell was distinguished by Creal, 155 F. Supp. 3d 831, which is more analogous to the instant case. The Creal plaintiffs alleged that they were made to work before and after their scheduled shifts, but were not paid for that work. The plaintiffs claimed that they were required to be in their workstations at the start of their shifts and, due to the size of the facility, they had to clock in early to comply. They also claimed that they were required to finish all tasks before clocking out and that doing so would often require them to work beyond their scheduled end times. They alleged that they were not paid for this time because the timekeeping system rounded clock-in times to the employee's scheduled start time when the employee clocked in less than fifteen minutes before and rounded clock-in times down to the employee's scheduled end time when the employee clocked in less than fifteen minutes after. They also alleged that their workload was such that they often worked during their unpaid meal breaks without compensation.

The Creal plaintiffs worked for a company called Group O that provided around-the-clock staffing at a Caterpillar plant. They worked in twenty seven different positions during one of three eight-hour shifts and "had different work duties, work locations, shifts, and supervisors." Id. at 840. The Creal court acknowledged the holding in Russell, which the plaintiffs relied on heavily, but noted that "[t]he Russell court was careful to distinguish . . . cases[ ] where a 'variety of job duties' and 'disparate individualized claims' are 'difficult for the court to manage collectively.'" Id. (quoting Russell, 721 F. Supp. 2d at 811 n.2, 815). The court concluded that this "rationale and reasoning counsel[ed] in favor of decertification" where the plaintiffs' claims

to unpaid work varied widely, and each "claim would require a separate determination of whether the employee was performing tasks that are compensable." Id. at 840—41.

As for the plaintiffs' claims regarding unpaid meal breaks, the Creal court found that a wide variance in the plaintiffs' claims "rais[ed] individualized questions regarding the necessity, frequency, and extent of work performed during unpaid meal breaks on an employee-by-employee (and lunch-by-lunch) basis." Id. at 842. The court found that the "same differences in employee positions, job duties, and supervisors" that counseled in favor of decertification of the pre- and post-shift work collective also counseled in favor of decertification of the unpaid meal collective. Further, because Group O's rounding and meal deduction policies did not, alone, violate the FLSA, the court found that those policies also did not "bind Plaintiffs together for the purposes of the 'similarly situated' inquiry." Id. at 841 (quoting Camilotes, 286 F.R.D. 339 at 350 (collecting cases)).

The claims in the instant case are even more disparate than the Creal plaintiffs' claims, and the inquiries into liability, leaving aside damages, are certain to be just as individualized, if not more so. Plaintiffs are not similarly situated where "significant factual differences exist among Plaintiffs' employment locations and work settings, job duties, supervision, and meal practices" such that "determining whether a Plaintiff has a viable claim will require detailed and individualized factual inquiries, and those individualized issues will predominate over any issues that are common to the class." Camilotes, 286 F.R.D. at 346 (citations omitted). That is precisely the situation in the instant case. Additionally, just as in Creal, Scrub's rounding and meal break policies, standing alone, do not violate the FLSA and therefore do not bind the plaintiffs together.

Plaintiffs also rely on Chabrier v. Wilmington Fin., Inc., 2008 WL 938872 (E.D. Pa. April 4, 2008), to support their argument against decertification. That reliance is totally misplaced. Even if Chabrier were binding on this court, which it is not, the facts that the Chabrier court relied upon in certifying a class of forty six individuals could not be more different than the facts in the instant case. In Chabrier, all of the opt-in plaintiffs "had the same job title, job description, job duties, and training." Id. at *1. They also all worked in the same office, were supervised by the same managers, and were subject to the same time recording system. Id. Based on those factors, the court, unsurprisingly, found that the plaintiffs were similarly situated. Id. at *3. Plaintiffs in the instant case do not satisfy even one of these factors. They are not similarly situated.

### B. Application of Affirmative Defenses

In deciding this second factor, the court also considers "whether defendants' defenses could be applied across the board to plaintiffs' claims . . . or whether many and perhaps disparate defenses could be raised." Russell, 721 F. Supp. 2d at 821. Defendants argue that decertification is appropriate because each of their affirmative defenses will require individual application to each opt-in plaintiff. For example, defendants claim that some of the opt-in plaintiffs were *overpaid* and that determining whether defendants are entitled to a setoff for the overpaid amounts, and what those amounts are, will require an individualized determination for each opt-in plaintiff. Defendants also argue that, because the amount of time the opt-in plaintiffs claim to have worked without compensation varies widely – with some claiming as few as five to ten minutes – some of the opt-in plaintiffs' claims are de minimis and properly uncompensated. Defendants further argue that this will have to be determined on an individual basis, particularly

considering at least one opt-in plaintiffs' admission that she often socialized or played on her phone after clocking in early.[31]

Rather than address defendants' argument that their affirmative defenses will require individual application, plaintiffs attack defendants' de minimis defense on the merits. Plaintiffs argue that their claims are not de minimis, particularly when each opt-in plaintiff's claimed compensable time is viewed in the aggregate. Plaintiffs even provide the court with an example of a hypothetical employee who worked four unpaid minutes each day to show that such an employee's damages over the course of a year are not de minimis. Plaintiffs' argument misses the point and, if anything, bolsters defendants' claim that their affirmative defenses would require an individualized inquiry for each opt-in plaintiff. Whether those defenses will ultimately be successful "is a matter for summary judgment or trial, not for certifying a collective action." Strait, 911 F. Supp. 2d at 720. This second factor weighs in favor of decertification where, as here, "the defense as to each Plaintiff would require consideration of different facts and individualized testimony that is unique to each plaintiff and could not be generalized among the . . . Plaintiffs." Camilotes, 286 F.R.D. at 352.

## C. Fairness and Procedural Concerns

Finally, the court must consider the fairness and manageability concerns associated with proceeding as a collective action. Where the case presents numerous individualized factual issues, this factor weighs in favor of decertification because "there is no judicial economy to be gained by allowing the[ ] claims to proceed collectively." Id. at 353 (internal quotations omitted). Although the court considers plaintiffs' interest in pursuing their claims collectively, it "must balance the reduced litigation costs to individual Plaintiffs with the potential effects that final certification may have on the fairness of the adjudication and the interests of manageability

---

[31] See note 10, supra.

and judicial efficiency." Id. (internal quotations omitted). Defendants argue that the collective action is unmanageable because plaintiffs have not presented (and cannot present) a reliable method to determine how much uncompensated work, if any, each opt-in plaintiff performed without conducting separate mini-trials. Plaintiffs counter this claim with two arguments that are equally unavailing.

Plaintiffs first argue that they have presented a reliable method of calculating the number of uncompensated hours: compare each employee's punch card with the corresponding input sheet to compare the amount of time that an employee recorded to the amount of time for which they were paid during the class period. This argument fails for a number of reasons. Most obviously, this is a reliable method for calculating uncompensated hours on an individual basis, not for the collective. Even then, it is reliable only if the employee was actually working at all times that they were clocked in. As described above, the opt-in plaintiffs' statements call this fact into question. Further, plaintiffs' proposed method does not take into account any time worked during unpaid meal breaks, which the opt-in plaintiffs did not clock out for, or any work an employee performed before clocking in. Again, as described above, these claims vary dramatically among the opt-in plaintiffs, and plaintiffs have not presented any method through which these claims could be resolved on a collective-wide basis.

Perhaps recognizing that their proposed method would require an individualized inquiry for each opt-in plaintiff, plaintiffs' fallback proposal is the selection of "representative plaintiffs to establish damages for the collective." The case law plaintiffs cite to support their argument that "[r]epresentative evidence may be used to establish damages for the class," Driver v. AppleIllinois, LLC, 2013 WL 5818899 (N.D. Ill. Oct. 29, 2013), does not support plaintiffs' position in the instant case. The Driver court found that "plaintiffs should be given the

opportunity" to provide representative testimony where the evidence showed that all of the members of the class were subject to a common policy and practice. Id. at *7. As explained above, the record in the instant case makes no such showing. The court further noted that "[i]n considering the sufficiency of representative testimony, the critical inquiry is not the (sic) whether the testifying employees' testimony is uniform as to damages, but rather whether it is sufficient to establish the amount and extent all plaintiffs worked 'as a matter of just and reasonable inference.'" Id. (quoting Espenscheid, 705 F.3d at 775 (7th Cir. 2013)).

The Seventh Circuit has held that such inference cannot be supported through "a small, unrepresentative sample" of proposed class members, particularly where there is no explanation as to how representatives are chosen and "no suggestion that sampling methods used in statistical analysis were employed to create a random sample of class members to be the witnesses." Espenscheid, 705 F.3d at 774—5. Without such safeguards, awarding the same amount of damages to an opt-in plaintiff who had worked only a few uncompensated hours and one who had worked dozens could potentially "confer a windfall" on the former while undercompensating the latter. Id. at 774. In the instant case plaintiffs have offered zero details as to how their "representatives" would be chosen and zero safeguards against inequitable distribution of damages, should they be awarded.

Considering the wide variance in the opt-in plaintiffs' claims in the instant case, the court sees no way to establish the amount and extent all opt-in plaintiffs worked as a matter of just and reasonable inference through the testimony of representative plaintiffs. And plaintiffs fail to propose one in the two sentences of their response brief that they dedicate to this argument. Accordingly, decertification is appropriate. See Camilotes, 286 F.R.D. at 354 (finding that manageability and fairness concerns are not allayed where "Plaintiffs' counsel generally suggest

that the various individualized inquiries could be handled through representative testimony" but "they offer no meaningful explanations of how this could be accomplished") (internal quotations omitted).

Simply put, plaintiffs have failed to demonstrate a factual nexus that ties them all together as victims of a particular violation of the FLSA. Although the opt-in plaintiffs all perform janitorial services, in terms of individual experiences the record demonstrates vast factual differences among the opt-in plaintiffs' work settings, experiences, and claims of uncompensated work. Consequently, it would be impractical and unfair for this case to proceed as a collective action.

## CONCLUSION

For the foregoing reasons, the court grants defendants' motion to decertify the collective action (doc. 533). Plaintiffs' pending motion for partial summary judgment (doc. 522) is denied without prejudice to refiling on behalf of the individual named plaintiffs. Defendants' motion for partial summary judgment (doc. 535) is denied as moot. This matter is set for a status report on May 31, 2017, at 9:00 a.m.

**ENTER:**  **May 23, 2017**

_____
**Robert W. Gettleman**
**United States District Judge**